**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**VERONICA RUCKER BARNETT,**

      **Plaintiff,**

                              **Civil Action 2:16-cv-902**
**vs.**                               **Judge James L. Graham**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## OPINION and ORDER

Plaintiff, Veronica Barnett, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 15), and the administrative record (ECF No. 8). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner of Social Security's nondisability finding is **AFFIRMED**.

## I.  BACKGROUND

In January 2013, Plaintiff filed applications for both supplemental security income and disability insurance benefits. (R. at 218–27.) Plaintiff maintains that she became disabled on December 31, 2005, as a result of chronic obstructive pulmonary disease (COPD), asthma, and panic attacks. (R. at 288.) Plaintiff's applications were denied initially and upon

reconsideration.  Plaintiff sought a de novo hearing before an administrative law judge ("ALJ").  (R. at 178–79.)

Plaintiff appeared and testified at the January 30, 2015, hearing, represented by counsel.  (R. at 47–79.)  A vocational expert also appeared and testified at the hearing.  (R. at 79–89.)  On May 20, 2015, ALJ Jeffery Hartranft issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 11–28.)  On May 29, 2015, Plaintiff filed a Request for Review of Hearing Decision Order.  (R. at 7.)   On July 19, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.      Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives alone in a one-story house.  (R. at 48.)  She has two adult children and is divorced.  (R. at 48-49.)  Plaintiff testified that she attended college for 2 ½ years, then prior to the hearing, she began school to be a chef.  (R. at 49.)  She only attended cooking school for four months because she became sick with the flu and was admitted to the hospital for 14 days, and the school releases a student's position after a 10-day period of absence.  (R. at 50.)

Plaintiff testified that she last worked in 2010 as a home health aide.  (R. at 50.)  She further testified that she is unable to work due to weakness in the left side of her body and chronic obstructive pulmonary disease that affects her breathing.  (R. at 65.)  She testified that some days she is unable to lift anything at all with her left side.  (*Id.*)  She also stated that she is frequently incontinent and wears Depends.  (R. at 66.)  She is too weak to lift her baby grandson.  (*Id.*)  Plaintiff has pins in her foot from a recent surgery and a boot that she wears sometimes.  If

she stands for a long time, her feet swell and she cannot put on shoes.  (*Id.*)

Plaintiff also testified to suffering from anxiety attacks due to feeling depressed about her physical health.  (*Id.*)  She testified that she has had shortness of breath since 2003.  (R. at 67.)  She testified she previously smoked cigars for about 15 years.  (R. at 68.)  Heat or cold, smoke in the air, perfume, and other respiratory irritants causes difficulty breathing.  (R. at 69.)  Plaintiff testified that she did stop smoking cigars in 2012, started again, and then she stopped smoking most recently four months prior to the hearing.  (R. at 73–74.)  Plaintiff admitted to going through a box of 25 small cigars in three days on average.  (R. at 74.)

Plaintiff testified she had no feeling in the two middle fingers of her left hand.  (R. at 69–70.)  She has been told this is the result of spinal cord damage.  (R. at 70.)  She had surgery on the toes of her right foot in January 2014 and on the left foot in October 2014.  If she stood for 45 minutes, her toes would start to throb and swell.  (R. at 70–71.)

When examined by her counsel, Plaintiff testified to having to stand for seven hours when she was in chef school in 2012 because they would not permit her to use a stool.  (R. at 77.)  Plaintiff testified that with her left hand, she is unable to button, pick up small things, or shuffle through papers.  (*Id.*)  She has to use her right hand for "everything."  (R. at 77–78.)  She has asked for a home health aide because she has difficulty doing household chores and dressing herself.  (R. at 78.)  She reported tendinitis in her shoulders that makes her unable to lift her hands over her head or brush the left side of her hair.  (*Id.*)  She has pain from the neck down to the low back, with some transient numbness in the right leg.  (*Id.*)  She uses a shower chair for bathing.  (R. at 79.)

B.    **Vocational Expert Testimony**

The vocational expert testified at the administrative hearing that Plaintiff's past jobs

include cook, a medium exertion, skilled job; home health aide, a medium exertion, semi-skilled position; hostess and security guard, both light, semi-skilled positions; and group home attendant, a medium, semi-skilled position. (R. at 80-81.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the vocational expert. (R. at 81-84.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the vocational expert testified that Plaintiff could perform approximately 474,000 unskilled, light and sedentary exertional jobs in the national economy such as an order clerk, retail marker, and inspector. (R. at 85-86.)

The vocational expert also testified that if the hypothetical individual had additional manipulative limitations, she would be able to perform the order clerk position. (R. at 88.) The vocational expert further testified that the job of order clerk could be performed even with a restriction of no interaction with the general public, though the numbers were reduced. (*Id.*)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Grant Medical Center**

The record shows Plaintiff presented to the emergency room reporting breathing problems three times in 2008 (R. at 739–810), six times in 2009 (R. at 813–892), and four times in 2010. (R. at 893–946.)

In February 2011, Plaintiff presented to the emergency room for shortness of breath. She reported that she had been out of Albuterol for the last week and reported a slight cough that was occasionally productive. She admitted to smoking tobacco, and occasional marijuana use. (R. at

4

332.)  On examination, she had scattered wheezing in the lungs and minimal coughing.  She had 5/5 muscle strength in all extremities.  Plaintiff was treated with Albuterol and Toradol.  (R. at 333.)

Plaintiff went to the emergency room for shortness of breath in October 2011, and on three occasions in December 2011.  (R. at 342-418.)  She indicated that she could not afford to see her primary care physician.  (R. at 356, 370.)  The emergency room physicians noted she had been noncompliant with her medications and continued to smoke.  (R. at 370, 385, 396.)

In April 2012, Plaintiff was treated in the emergency room for shortness of breath.  Diffuse bilateral wheezes were noted.  (R. at 440–41.)  In June 2012, Plaintiff went to the emergency room for an asthma attack.  Her breathing was labored and dense wheezing was found bilaterally with diminished breath sounds.  (R. at 470–71.)   In November 2012, Plaintiff presented to the emergency room for asthma and shoulder pain, reporting that a U-Haul door fell on her right shoulder.  Her x-ray was normal.  On examination, she exhibited bilateral expiratory wheezes.  Plaintiff was diagnosed with asthma exacerbation.  (R. at 505–06.)  In December 2012, Plaintiff went to the emergency room twice for asthma and dyspnea.  (R. at 536-37, 553–54.)  Her lungs had inspiratory wheezes with expiratory rhonchi throughout.  (R. at 554.)

When seen in May 2013, Plaintiff complained of chest pain.  On examination, her lungs were clear to auscultation, heart was regular rate and rhythm, and there was no edema in her extremities.  (R. at 595.)  She was admitted to rule out any cardiac issues and was found to be acceptable for discharge.  (R. at 619-20.)

### 2. John E. Ratliff, M.D.

The record contains clinical notes from John E. Ratliff, D.O., a primary care physician, showing treatment from December 2012 through May 2013. (R. at 571–80, 628–42.) In February 2013, Plaintiff complained of lower back pain, right shoulder pain, and difficulty lifting her arm. On examination her BMI was recorded at 33, with a height of 64" and weight at 199 pounds. Her blood pressure was measured at 140/90. She was tender to palpation of her right shoulder and lower back. Plaintiff was assessed with COPD (Bronchitis-Emphysema), chronic lower back pain, GERD and cephalgia. (R. at 572–73.)

When seen in May 2013, Plaintiff complained of chest pain. On examination, Plaintiff reported joint pain and stiffness in her extremities. Her lower back was tender. (R. at 629–30.)

A cervical spine MRI taken in November 2013 showed severe spinal stenosis at C5-6, moderately severe stenosis at C6-7, and some narrowing at C7-T1. There was severe cord compression at C5-6 and moderate narrowing at C4-5 and at C6-7. (R. at 662–63.) The MRI of her thoracic spine was normal. (R. at 664.)

### 3. The Breathing Association Lung Health Clinic ("Breathing Association")

Plaintiff consulted with the Breathing Association in February 2012. She reported suffering from shortness of breath, coughing, wheezing, and nocturnal dyspnea over the past several months. She said she was a long-term smoker who lived with a house full of smokers. She was seen at the Mount Caramel medical bus and referred for assistance with her medications. (R. at 654.) Plaintiff had a normal gait and station and no wheezing or use of accessory muscles in the respiratory examination. (R. at 655.) Spirometry showed a forced vital capacity (FVC) measured at 1.91, which was 53% of Plaintiff's predicted volume. Her forced

expiratory volume at one second (FEV1) was measured at 1.31, or 46% of the predicted volume. (R. at 653.) Plaintiff was diagnosed with chronic obstructive bronchitis without an exacerbation and given prescriptions for medications and a free nebulizer. (R. at 656.) She was also referred to no-cost primary care and women's health, vision, dental, and pharmacy services. (R. at 657.)

In July 2013, Plaintiff followed up with the Breathing Association for evaluation. She reported that she still occasionally smoked. (R. at 649.) Plaintiff had a normal gait and station and slight left-sided wheezes. (R. at 650.) Spirometry showed a FVC of 2.22 which was 62% of Plaintiff's predicted volume. Her FEV1 was measured at 1.74, or 61 % of the predicted volume. (R. at 653.) Plaintiff's diagnosis remained chronic obstructive bronchitis without an exacerbation. (R. at 651.) She was given prescriptions for medications and also referred again to no cost primary care and women's health, vision, dental, and pharmacy services. (R. at 652.)

Plaintiff returned in September 2013 and January, May, and September 2014. In 2014, she reported that she was a daily smoker. She complained of shortness of breath, productive cough, and wheezing. Plaintiff had a normal gait and station, and no wheezes, rales, or rhonchi. She was given prescriptions for medications and also referred to no-cost primary care and women's health, vision, dental, and pharmacy services. On all occasions, she received counseling on tobacco cessation. (R. at 712–35.) Spirometry results during this period showed FVC of 53% to 72% of the predicted volume and FEV1/FVC of 76-97 of the predicted volume. (R. 736–38.)

### 4.     Ohio Health Neurological Physicians

Michael Meagher, M.D., a consulting neurologist, evaluated Plaintiff on March 4, 2014. Dr. Meagher noted that Plaintiff had long-standing numbness and tingling in her arms, chronic

COPD and asthma. On examination, Dr. Meagher found "fairly profound weakness" in her left-hand muscles, and sensory loss in her left hand compared to the right. He believed that the C5-C6 cord compression was causing Plaintiff's symptoms and referred her to a spine surgeon in his practice. (R. at 684-85.)

An MRI of the lumbar spine showed a small central disc protrusion at L5-S1 and a shallow disc bulge at L3-L4 with mild congenital spinal canal stenosis. (R. at 686-87.)

Plaintiff underwent a C5-C6, C6-C7, C7-T1 anterior cervical microdiskectomy and fusion on March 20, 2014 with Brian Seaman, D.O. (R. at 688-90.) In June 2014, Dr. Seaman reported that Plaintiff was doing quite well with improvement of her radiculopathy and myelopathy. At that time, she had some shoulder discomfort and aches and pains, but her x-rays and fusion looked great. She was using a bone stimulator and no longer needed to wear a cervical collar. She was doing quite well in physical therapy. He concluded that he was "happy with her progress to date." (R. at 693.)

In July 2014, Plaintiff had improved grip strength and range of motion bilaterally. (R. at 1228-30.) In September 2014, Plaintiff reported minimal neck pain and had improved strength in her left hand. She was happy with her progress and had returned to normal activities. (R. at 1263.)

In January 2015, Dr. Seaman reported that Plaintiff had done well following her cervical spine surgery. At that time, she complained of pain in her low back, paresthesias in her lower extremities, and urinary incontinence. She described an inability to sense her bladder and stated she has to rush to the bathroom or else she will have an accident. Dr. Seaman indicated that this has been an ongoing issue for her, in conjunction with the paresthesias in the right lower

extremity and intermittently in the left lower extremity.  Dr. Seaman was concerned that her

epidural lipomatosis and lumbar stenosis might be playing a role.  He referred Plaintiff to a

urologist.  (R. at 1259-60.)

### 5.  State Agency Evaluation

On May 24, 2013, Maria Congbalay, M.D., a state agency physician, reviewed the record

and assessed Plaintiff's physical functioning capacity.  (R. at 93–102.)  Dr. Congbalay opined

that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand

and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at 100.)

Dr. Congbalay found that Plaintiff was limited in push and/or pull in her left upper extremity.

(*Id.*)  Dr. Congbalay also found that Plaintiff had manipulative limitations, including occasional

handling and fingering with the left upper extremity due to weakness and decreased grasp and

manipulation.  (R. at 101.)  According to Dr. Congbalay, Plaintiff could occasionally crawl, but

never climb ladders, ropes, or scaffolds.  (R. at 101.)  Dr. Congbalay also found Plaintiff would

need environmental limitations due to her COPD.  (R. at 102.)  Dr. Congbalay assigned great

weight to the opinion of Robert Whitehead, M.D., who performed a physical consultative

examination in April 2013 and reported that plaintiff had a loss of grip strength and decreased

sensation in the left hand.  (R. at 100.)

Gary Hinzman, M.D., reviewed Plaintiff's records upon reconsideration on September

2013 and confirmed Dr. Congbalay's assessment.  (R. at 128-33.)

### B.  Mental Impairments

### 1.  Stephen Meyer, Ph.D.

Dr. Meyer examined Plaintiff on behalf of the state agency on April 1, 2013.  (R. at 581-

86.)  Plaintiff reported that she was applying for disability because of COPD, asthma, and panic

attacks. (R. at 581.) She further indicated that she did not have a history of psychiatric

hospitalizations, but received mental health counseling following her divorce in 1997. When

discussing her work history, Plaintiff's longest period of employment was six years for the same

company, and she denied any difficulties getting along with coworkers or supervisors, or in

following instructions on previous jobs. She said she could not work because of her physical

problems. (R. at 582.)

Plaintiff reported that she rises at six o'clock in the morning, cares for her pets, does

household chores, has a breathing treatment, takes a walk, and watches television. Her

grandchildren visited her occasionally. She does not go too far from home and usually doesn't

visit others. She is involved with her church and helps feed people in the community. Her adult

daughter and son check on her every day. She has a boyfriend whom she sees daily. She does

the housework, cooking, and shopping, independently, although her pastor's wife occasionally

takes her to the store or to doctors' appointments. (R. at 583.)

Dr. Meyer found that Plaintiff was cooperative and talkative and that she related in a

friendly, pleasant manner. Her facial expressions varied from normal to exaggerated, and she

used frequent hand gestures. She said she does not go too far from home because she worries

about having a panic attack in public. Dr. Meyer noted that at times during this evaluation,

Plaintiff was dramatic and worked herself up with gasping breaths. She reported a history of

anxiety and panic symptoms, but did not manifest any obvious signs of anxiety. Plaintiff

described her panic attacks as difficulty breathing and pain in her lungs (R. at 583-84.)

Dr. Meyer assessed Plaintiff with a depressive disorder NOS and an anxiety disorder

NOS. (R. at 584-85.) He opined that Plaintiff had no difficulty understanding simple or

moderately complex instructions. He noted she was able to read and write, attended college for two years, had a good work history, and denied having any problems following instructions at her prior jobs. He noted her cognitive abilities appeared commensurate with her educational background. He opined that she had the cognitive capacity to understand, remember, and carry out simple and complex instructions and would be expected to be able to perform simple and complex routine work within her physical restrictions. Dr. Meyer also found that Plaintiff displayed no evidence of concentration, persistence, or pace problems based on her performance on the mental status examination. He noted that she was able to maintain attention to complete the interview and was functional in her activities of daily living. He believed that she would be expected to be able to perform adequately in a work setting without strict production requirements. With regard to her social functioning, he noted that historically, Plaintiff had not had any problems getting along with people, although she reported some social avoidance. She had not had any conflicts or misconduct within the work environment. He noted she was friendly, talkative, and cooperative during the assessment. He discussed that Plaintiff used many hand gestures during the interview and was somewhat dramatic at times. He noted that Plaintiff was somewhat restricted socially, but did socialize regularly with her family and others. He opined that Plaintiff would be expected to be able to perform in a low social setting, with intermittent/occasional interactions with coworkers and supervisors. (R. at 585.) In discussing her ability to respond appropriately to work pressures, Dr. Meyer opined that Plaintiff would be able to perform in a lower stress work setting, with assistance if needed at times of change in routine. (R. at 586.)

### 2. State agency review

In April 2013, Aracelis Rivera, Psy.D., a state-agency psychologist, reviewed the medical

record and assessed Plaintiff's mental condition. (R. at 93-72.) Dr. Rivera based his evaluation on the medically determinable impairments of an affective disorder and anxiety disorder. (R. at 98.) Dr. Rivera concluded that Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation. (*Id.*) Dr. Rivera also found that the evidence did not establish the presence of the "Part C" criteria. (R. at 99.) Dr. Rivera also determined that there was no psychological evidence in the file prior to the April 2013 psychological consultative examination. (*Id.*) Dr. Rivera noted that Plaintiff's allegations were credible. (*Id.*) Dr. Rivera found that Plaintiff was moderately limited in the following areas: the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism with supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to respond appropriately to changes in the work setting. (R. at 103.) He observed that Dr. Meyer's opinion was consistent with the objective evidence. (R. at 100.) Dr. Rivera concluded that Plaintiff is limited to superficial social interactions and is capable of adapting to a low stress work setting. (R. at 103.)

In September 2013, Cynthia Waggoner, Psy.D. a state-agency psychologist, reviewed the mental health evidence upon reconsideration and affirmed Dr. Rivera's assessment. (R. at 123-35.)

## IV. THE ADMINISTRATIVE DECISION

On June 18, 2015, the ALJ issued his decision. (R. at 11–28.) Plaintiff met the insured status requirements through June 30, 2015. At step one of the sequential evaluation process required under 20 C.F.R. § 416.920(a)(4), the ALJ found that Plaintiff had not engaged in

substantially gainful activity since December 31, 2005, the alleged onset date. (R. at 13.) At step two, the ALJ found that Plaintiff had the severe impairments of chronic obstructive pulmonary disease, cervical degenerative disc disease with radiculopathy and weakness in the non-dominant left upper extremity, depressive disorder, anxiety disorder, and bunions. (R. at 14.) The ALJ determined that Plaintiff's migraine headaches, hypertension, incontinence and degenerative disc disease were non-severe impairments. (R. at 14–15.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally push and pull with her non-dominant left upper extremity. She can frequently handle and finger with both upper extremities. She should avoid more than moderate exposure to irritants such as fumes, dust and gasses and work in environments with only moderate exposure to poorly ventilated areas. The claimant is able to perform low stress jobs, defined as work requiring only occasional decision-making and with no more than occasional changes in the work setting. She can do work requiring no contact with the general public and only occasional contact with coworkers and supervisors.

(R. at 17–18.) In reaching this determination, the ALJ assigned "great weight" to Dr. Meyer's opinion and found that Dr. Meyer's opinion is consistent with medical evidence showing few limitations in function due to mental impairments. (R. at 25.) In assessing Plaintiff's manipulative limitations, the ALJ afforded only some weight to the consultative opinion of Dr. Whitehead because it reflected Plaintiff's condition prior to her cervical spine surgery. (R. at 21.)

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy and that Plaintiff was not disabled under the Social Security Act. (R. at 26-27.)

## VII.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. ANALYSIS

Plaintiff puts forward three assignments of error. Plaintiff first contends that the ALJ erred by failing to weigh the opinions of the state agency medical consultants. (ECF No. 9 at 6.) Plaintiff also argues that the ALJ erred by accepting the opinions of consulting examiner Stephen Meyer, Ph.D., but then failing to adopt all of his opined limitations without explanation. (*Id*. at 9.) Finally, Plaintiff contends that the ALJ failed to properly account for all of Plaintiff's limitations in his RFC formulation. (*Id*. at 10.)

## A. The ALJ Properly Weighed State Agency Physician Opinion Evidence

In her first assignment of error, Plaintiff argues that the ALJ erred by failing to weigh the state agency experts' findings, which were more restrictive with respect to Plaintiff's limitations than the ALJ's findings. (*Id*. at 6.) Specifically, Plaintiff maintains that it was error not to credit State agency doctors' opinions "that beginning in January 2013, plaintiff was limited to . . . only occasional handling and fingering with the left upper extremity due to weakness and decreased grasp and manipulation. . . . [and] superficial social interactions and to work in a low stress work setting. (*Id*. at 7 (internal emphasis omitted).) In contrast, Plaintiff notes, the ALJ's RFC determination limited Plaintiff to frequent handling and fingering. *Id*. at 8. In support of giving the state agency opinions great weight, Plaintiff cites the April 2013 report of Dr. Whitehead,

which stated that Plaintiff's consultative examination "revealed loss of intrinsic strength and decreased grip strength, a loss of motion in the wrist with extension as well as with adduction and abduction. Sensation was decreased in the hand on the third, fourth and fifth digits." (*Id.*)

The regulations state that the ALJ, regardless of a medical opinion's source, will evaluate the opinion based on the following factors: whether there was an examining relationship, whether the opinion was made by a treating source, the length of the treating relationship, the supportability of the opinion's conclusions, the consistency of the opinion with the record as a whole, any specialization of the opinion source, and other factors raised by Plaintiff. 20 C.F.R. § 404.1527(c). The ALJ may give the opinions of non-examining state agency doctors weight "only insofar as they are supported by evidence in the case record." SSR 96-6p. The ALJ is specifically directed to consider whether the state agency doctors' opinions are supported by "evidence received at the administrative law judge . . . level[ ] that was not before the state agency." (*Id.*) Where an ALJ's opinion satisfies the goal of § 404.1527(c) and is otherwise supported by substantial evidence, the failure to explicitly provide the weight assigned is harmless. *See, e.g.*, *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 839 (6th Cir. 2005) (harmless error where the ALJ failed to mention or weigh the report of consultative neurologist who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart*, 112 F. App'x 463, 467–69 (6th Cir. 2004) (failure to discuss or weigh opinion of consultative examiner was harmless error).

Plaintiff correctly notes that the ALJ did not specifically assign a weight to the opinions of the state agency doctors. However, the state agency doctors both listed Dr. Whitehead's April 2013 examination as the source of evidence for their opinions of Plaintiff's left-hand physical

restrictions.  (R. at 100, 131.)  Although the ALJ was not required to give "good reasons" for the weight given to non-treating source opinions such as those of Dr. Whitehead, *see Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007), here the ALJ did give good reasons for giving only some weight to Dr. Whitehead's opinion.  (R. at 21.)  The ALJ stated that because Dr. Whitehead's 2013 examination occurred prior to Plaintiff's cervical spinal surgery in March 2014, his opinion was accorded only "some weight, in so far [as it] reflects the claimant's condition prior to treatment of her cervical disc disease." (*Id*.)  The ALJ also discussed post-surgery medical records which reported that Plaintiff did "quite well" after surgery, *see* Exhibit 26F; that in July 2014, plaintiff had improved grip strength and range of motion bilaterally, *see* Exhibit 54F; and that a September 2014 examination record noted that Plaintiff had improved strength in the left hand and had returned to normal activities, *see* Exhibit 56F.  By giving Dr. Whitehead's opinion only some weight, the ALJ essentially assigned the same weight to the opinions of the state agency physicians insofar as they were based on the hand use restrictions opined by Dr. Whitehead.   The ALJ properly applied the factors set forth in 20 C.F.R. § 404.1527(c) in considering the expert opinions and found them unsupported in light of the evidence of Plaintiff's post-surgery condition.

The Court finds that the ALJ's weighing of Dr. Whitehead's opinion, and, by extension, the opinions of the state agency doctors, is supported by substantial evidence.

**B. Failure to Incorporate All of Dr. Meyer's Findings in the RFC**

In her second assignment of error, Plaintiff argues that the ALJ erred in failing to incorporate a restriction in the RFC which reflected Dr. Meyer's findings that "plaintiff retained the ability to perform simple and complex routine work in a setting without strict production

requirements." (ECF No. 9 at 9.) Plaintiff argues that by accepting Dr. Meyer's opinion and giving it great weight, he also adopting Dr. Meyer's finding Plaintiff "is expected to be able to perform adequately (within her physical restrictions) in a work setting without strict production requirements." (R. at 585). Plaintiff argues that a restriction that she cannot work under strict production requirements would require a finding of disability because all of the jobs the ALJ determined are available to Plaintiff require maintaining a specific level of productivity. (*Id*. at 9-10.)

An ALJ's decision to give great weight to medical opinion evidence does not require the ALJ to incorporate every restriction proposed by the medical source. *Salisbury v. Comm'r of Soc. Sec.*, No. 5:11-CV-2277, 2013 WL 427733, at *7 (N.D. Ohio Feb. 1, 2013). "Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009); *See* 20 C.F.R. § 404.1527(e)(1). "[T]he ALJ's findings are not to be overturned unless there is no substantial evidence supporting such conclusions." *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).

The ALJ referred to the fact that "Dr. Meyer believed [Plaintiff] could perform adequately in a work setting without strict production requirements." (R. at 25.) However, the ALJ also noted that Dr. Meyer's own observation in the same paragraph that Plaintiff's mental status examination revealed "no evidence of difficulties with concentration, persistence, or pace." (R. at 25.) While Dr. Meyer stated that plaintiff "is expected to be able to perform adequately ... in a work setting without strict production requirements[,]" he did not state that this was a required restriction. In light of Dr. Meyer's comment that he saw no evidence of

difficulties with concentration, persistence, or pace, the ALJ could reasonably conclude, and obviously decided, that the lack of strict production requirements was not being advanced by Dr. Meyer as a needed restriction in Plaintiff's case. However, the ALJ did accept Dr. Meyer's recommendation that plaintiff be limited to "a lower stress work setting" due to the fact that Plaintiff "is somatically focused and her physical symptoms cause anxiety." (R. at 586.) The ALJ stated,

> Because of [Plaintiff's] somatic focus and anxiety about her physical symptoms, [Dr. Meyer] expected the claimant to be able to perform best in a low stress work setting, with assistance if needed during times of change in routine. This opinion is the result of his own observations, a clinical interview, and a mental status evaluation. Furthermore, as a consultant for the Social Security Administration, he has knowledge of [the] Social Security Administration's program and requirements. Dr. Meyer's opinion is consistent with medical evidence showing few limitations in function due to mental impairments. Therefore, his opinion is accepted and given great weight.

(R. at 25.) To address the need for a low stress work setting, the ALJ specified in the RFC that plaintiff could perform "low stress jobs, defined as work requiring only occasional decision-making and with no more than occasional changes in the work setting." (R. at 18.) In specifying this definition of "low stress jobs," the ALJ made it clear that he did not find that a restriction on strict production requirements was needed in Plaintiff's case. Plaintiff's RFC also included the restriction that plaintiff could "do work requiring no contact with the general public and only occasional contact with coworkers and supervisors." (R. at 18) Although this restriction is typically included to address limitations in socialization, it would also operate to mitigate job stress. The decision of the ALJ not to incorporate a limitation on jobs with strict production requirements is also supported by the April 18, 2013, opinion of Aracelis Rivera, Psy. D. and the September 4, 2013, opinion of Cynthia Waggoner, Psy, D., state agency examiners, who stated

that Plaintiff did not have sustained concentration and persistence limitations, and could adapt to a low stress work setting.  (R. at 103, 134-35.)

As the discussion above demonstrates, although the ALJ gave great weight to Dr. Meyer's medical opinion evidence, he exercised his authority to make the ultimate capacity-to-work determination.  *Nejat*, 359 F. App'x at 578.  The ALJ's RFC determination is supported by substantial evidence in the record, including Dr. Meyer's own mental status examination results. Accordingly, the ALJ's decision not to incorporate a specific limitation precluding jobs with strict production requirements is supported by substantial evidence and affords no basis to overturn the ALJ's findings.  *Kirk*, 667 F.2d at 535.

## C.  The ALJ's Step Five Determination is Supported by Substantial Evidence

In Plaintiff's third assignment of error, she argues that because the ALJ found at step four of the evaluation process that Plaintiff has moderate difficulties with regard to concentration, persistence or pace, (R. at 17), he should have included language to that effect in the RFC as well as in his hypothetical question to the vocational expert .  The ALJ's hypothetical to the vocational expert tracked the language of the RFC, limiting plaintiff to "a low-stress job, which is defined as having only occasional decision-making required and there being only occasional changes in the work setting; that the individual should not have contact with the general public and only occasional contact with coworkers and supervisors."  (R. at 84.) According to Plaintiff, the ALJ's determination that she experiences moderate limitations in the areas of social functioning and concentration, persistence or pace requires an inclusion of parallel language in the ALJ's RFC determination and the hypothetical question posed to the vocational expert However, the ALJ's bare statement finding that "[w]ith regard to concentration, persistence or

20

pace, the claimant has moderate difficulties" says nothing about what type of restrictions, if any, he felt were needed to accommodate these difficulties.

Plaintiff relies on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010). However, *Ealy* is readily distinguishable on its facts. In *Ealy*, an expert expressed a restriction, with which the ALJ agreed, that the claimant was limited to simple, repetitive tasks for "[two-hour] segments over an eight-hour day where speed was not critical." *Id.* at 516. The court held that the ALJ's hypothetical question to the vocational expert, which only asked him to assume that the claimant was "limited to simple, repetitive tasks and instructions in non-public work settings" did not adequately reflect the claimant's limitations because it truncated the doctor's specific restrictions. *Id.*

In this case, the ALJ's statement that Plaintiff has moderate difficulties with regard to concentration, persistence or pace is not phrased in terms of a job restriction. Rather, it is found in the section of the decision which addressed whether Plaintiff's impairments qualified as listed impairments, not at the step five level which discussed Plaintiff's RFC and whether her physical or mental impairments would impact her ability to work. No inconsistency arises due to the ALJ's failure to include that precise statement in the RFC or in his hypothetical question. Likewise, the ALJ did not fail to include in the hypothetical question any expert-opined restriction with which he agreed. As discussed above, the ALJ noted that Dr. Meyer observed no difficulties with concentration, persistence or pace during his evaluation of the Plaintiff. The ALJ obviously did not find that there was a need to confine Plaintiff to jobs without strict production requirements. The ALJ did adopt the restriction recommended by Dr. Meyer, *see* R. at 586, that Plaintiff be limited to "a lower stress work setting" to address plaintiff's anxiety.

The ALJ reasonably concluded that this could be accomplished by the restrictions in the RFC which limited Plaintiff to "low stress jobs, defined as work requiring only occasional decision-making and with no more than occasional changes in the work setting" and "work requiring no contact with the general public and only occasional contact with coworkers and supervisors." (R. at 18.) These restrictions were included in the ALJ's hypothetical question to the vocational expert.

The ALJ's RFC determination is supported by substantial evidence in the record, and the ALJ did not err in posing a hypothetical question to the vocational expert which mirrored this RFC.

## IX. CONCLUSION

In conclusion, for the reasons stated above, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner of Social Security's decision is **AFFIRMED**. The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

Date: September 26, 2017

S/ James L. Graham
**James L. Graham**
**UNITED STATES DISTRICT COURT**